## CALIFORNIA ELECTRIC POWER CO. v. UNITED STATES.

Nos. 45688, 45916.

Court of Claims.

May 7, 1945.

¹ To be contracted for as needed.

Henry W. Coil, of Riverside, Cal. (Douglas L. King, of Riverside, Cal., on the brief), for plaintiff.

William A. Stern, II, of Washington, D. C., and Francis M. Shea, Asst. Atty. Gen., for defendant.

Before WHALEY, Chief Justice, and LITTLETON, WHITAKER, JONES, and MADDEN, Judges.

MADDEN, Judge.

In these two cases we have written one set of findings of fact and one opinion. In case No. 45688 the plaintiff sues for $82,172.54, claiming that it was overcharged this amount by the Government for electric power taken by the plaintiff from a generating plant at Boulder Dam, in that it was denied a "load-building" or "load-absorption" period which, if granted, would have reduced its charges by the amount stated. In case No. 45916 the plaintiff sues for $184,081.31 which, it claims, it was overcharged for Boulder Dam electric power under an "interim" contract with the Government, in that it was required to pay 1.63 mills per kilowatt-hour for secondary power when the lawful price for such power was only .5 mill. References to the plaintiff apply, depending on the time of the action referred to, to the plaintiff's former wholly owned subsidiary, the Southern Sierras Power Company, or to the plaintiff itself, either under its former name, the Nevada California Electric Corporation, or under its present name.

The Boulder Canyon Project Act of December 21, 1928, 45 Stat. 1057, 43 U.S. C.A. § 617 et seq., required the Secretary of the Interior to obtain contracts, from future purchasers of power to be generated at the dam, adequate in his judgment to insure the payment of all costs of operation and maintenance and the repayment within 50 years from the date of completion of the project of the cost of building it, with interest. Unless and until such contracts were obtained, no money was to be spent in constructing the dam. The Secretary, on April 26, 1930, made a contract for the lease of the power privileges at the dam to the City of Los Angeles and the Southern California Edison Company. The City agreed to operate a part of the power plant machinery of the dam and to generate electricity at cost for itself, the Metropolitan Water District, the States of Nevada and Arizona if and when they should elect to take power, and certain other municipal corporations which were, by contracts to be made, to receive allotments of power. Edison similarly agreed to operate the rest of the generating equipment to supply power to itself and to the plaintiff and the Los Angeles Gas and Electric Corporation. The lease contract provided that the City and the other municipalities should be entitled and obligated to take power when the Secretary should announce that 1,250,000,000 kilowatt-hours per year of energy were ready for delivery; that the Metropolitan Water District, with which the Secretary on the same day made a contract for a large allotment of power, was to become entitled and obligated to take power when the Secretary should announce that 2,000,000,000 k. w. h. were available, but not sooner than 1 year after the commencement of delivery to the city;

and that Edison and the other private allottees were to become entitled and obligated to take power when water capable of generating 4,240,000,000 k. w. h. was available, but not sooner than 3 years after commencement of delivery to the City. The lease was to run for 50 years from the date when delivery of power to the City should begin.

In the autumn of 1931, the Secretary made separate contracts with the cities of Pasadena, Glendale, and Burbank, California, the Los Angeles Gas and Electric Corporation and the plaintiff. The plaintiff's contract was dated November 5, 1931. In each of these contracts the allottee agreed to take and/or pay for the percentage named in the contract of the whole amount of firm energy to be generated at the dam, at the price of 1.63 mills per k. w. h.

The lease and the several contracts allotted, by percentages, the entire 4,240,000,000 k. w. h. per year among the several allottees as firm power, i. e., as power which the Government bound itself to deliver and the allottees bound themselves to pay for. The rate to each allottee for firm power was 1.63 mills per k. w. h., except as that rate was affected by the load-building or absorption period discussed hereinafter. It was contemplated that there would actually be more than 4,240,000,000 k. w. h. of power available, and the possible excess was secondary power. Rights in secondary power were specified in the lease and the contracts, and the rate for it was set at .5 mill per k. w. h. The table in finding 8 shows the rights of the parties to firm and secondary power.

In the lease a concession was made to the City of Los Angeles and to Edison, that they would not, for the first three years that each was bound to pay for power, be obliged to take or pay for their full ultimate allotments at the firm power rate. It was provided that, for the first, second, and third years only 55, 70, and 85 percent, respectively, need be taken, and that if more than those percentages were in fact taken, the excess would be charged for only at the .5 mill secondary power rate. This was the "load-building period" privilege, which, as we shall see, the plaintiff claims it did not get, which claim is the basis for the suit in case No. 45688. This privilege was given to the Metropolitan Water District in its contract of April 26, 1930, which was also the date of the lease. It was not given to the 3 smaller cities, nor to the Gas Company, nor to the plaintiff, in their contracts made in the autumn of 1931. As we shall see, it was later given to all of the municipalities, and to the city of Los Angeles, as the successor to the Gas Company, but not, at least in the same form, to the plaintiff, though the Government urges that it was given to the plaintiff in substance.

Contracts adequate to reimburse the Government having been made, the Government proceeded with the building of the dam. As building progressed, the prospect was that the Secretary would announce the availability of 1,250,000,000 k. w. h. per year of power, which announcement would put into effect the obligation of the City of Los Angeles to begin to pay for its percentage of power, about June 1, 1937. The dam was expected to be completed in 1936. But all the water in the river could not be impounded while the depth necessary to generate 1,250,000,000 k. w. h. was built up, since persons downstream had the right to a flow of some of the water for irrigation and other uses. Hence, some water would have to be released, and if it was put through the generating equipment, power not contracted for would be available. It was also expected that in the interval between each announcement and the succeeding one, water would be available to generate more power than the amount covered by the original contracts. As early as 1934 the City of Los Angeles, Edison, and the plaintiff applied to the Secretary for "interim" contracts to buy this power, when it should become available, at the .5 mill secondary power rate. The City objected to the plaintiff's getting any of it at that rate, because the plaintiff's "interim" would continue for some three years after the City began to pay the firm power rate of 1.63, and, the City claimed, the plaintiff was in competition with it at various points. A conference was held in Washington at which representatives of the City, the plaintiff, the United States Bureau of Reclamation and the Department of the Interior prepared and signed, on October 3, 1934, a "Memorandum of Understanding." See finding 10. This memorandum provided that the City should have an interim contract at the secondary rate until it became bound, under the lease, to take power at the firm rate; that the plaintiff should have a similar interim contract until it, in its turn, became so bound; and that the cities of Pasadena, Glendale, and Burbank should

have load-building privileges. In the memorandum the City withdrew its objection to the plaintiff's receiving an interim contract. The Secretary never approved the agreement embodied in the memorandum, however, and the plaintiff never received an interim contract on the terms provided in the memorandum. On October 22, 1934, the City was given an interim contract to take power at the .5 mill rate from the time sufficient water became available until the time when it became bound to pay the firm power rate under the 1930 lease. On October 30, 1934, Pasadena and Burbank, and on November 1, Glendale, were given supplemental contracts giving them 3 year load-building periods similar to those given in 1930 to the City, Edison, and Metropolitan. These municipalities were, as we have seen, to begin to take firm power at the same time as the City, so their load-building periods were to be concurrent with that of the City. The Secretary in 1934, 1935, and 1936, refused, though requested, to give the plaintiff either a load-building period, or an interim contract at the .5 mill rate.

In May 1937 the Secretary announced that 1,250,000,000 k. w. h. per year would be available June 1, 1937, thereby obligating the City of Los Angeles and the three smaller cities to begin to take power at the firm rate, as modified by the load-building privilege, from the latter date. The City's interim contract thus came to an end on May 31, 1937. On July 22, 1937, the plaintiff was given a supplemental or interim contract to be operative for the period of approximately 3 years which would elapse before the availability of the full 4,240,000,000 k. w. h. would be announced and the plaintiff's permanent contract would go into effect. This interim contract provided that the plaintiff should receive 114,280,000 k. w. h. the first year, and specified amounts slightly less than that for the second and third years, of "firm" energy at the 1.63 mills rate, and additional energy at the .5 mill rate. The contract designated the named amounts of energy as "firm" energy, but the energy was not "firm" within the meaning of that term as used in the lease, the other contracts and the regulations. It was completely subordinate to the rights of the City, though the prospect was that it would in fact be available and it turned out to be available for the three-year period. It was also subject in various ways to the will of the Secretary. This interim contract gave the plaintiff, for the interim period, the load-building conces-

sion which meant that only 55, 70, and 85 percent of the specified amounts of "firm" energy had to be taken and paid for at the 1.63 mills rate during the first, second, and third years, respectively, of the interim contract, amounts taken in excess of those percentages carrying only the .5 mill rate. The refusal to give the plaintiff a .5 mill rate for all power taken under its interim contract is, as we have said, the basis for its suit in No. 45916.

In No. 45688 the plaintiff's claim is based on the fact that it was not given a load-building period which would have reduced the price of its power from 1.63 mills to .5 mill per k. w. h. for 45, 30, and 15 percent of the firm power which it took during the first, second, and third years of the period of its permanent contract, i. e., from June 1, 1940 to May 31, 1943. As appears above, all other parties to the lease and the contracts made in 1931 were given such a period. In support of its claim for equal treatment in this regard, the plaintiff cites the Boulder Canyon Act, 45 Stat. 1057, 43 U.S.C.A. § 617, the Regulations issued by the Secretary of the Interior, the basic lease to the City and Edison, and the contracts with the plaintiff and others. Section 5 of the Act provided, in part:

"That the Secretary of the Interior is hereby authorized, under such general regulations as he may prescribe, to contract for the * * * generation of electrical energy and delivery at the switchboard to States, municipal corporations, political subdivisions, and private corporations of electrical energy generated at said dam, upon charges that will provide revenue which, in addition to other revenue accruing under the reclamation law and under this act, will in his judgment cover all expenses of operation and maintenance incurred by the United States on account of works constructed under this act and the payment to the United States under subdivision (b) of Section 4. * * *

"General and Uniform regulations shall be prescribed by the said Secretary for the awarding of contracts for the sale and delivery of electrical energy. * * *"

The Secretary's General Regulations, promulgated on April 25, 1930, after conferences with the municipalities and companies which were to take the power, provided for the making of the lease to the City and Edison; defined firm and secondary energy; fixed the rate per k. w. h. for each class of energy; allocated the energy

among the lessees and allottees, and fixed the minimum annual obligations of each lessee and allottee. The lease, as we have seen, was dated April 26, 1930, and leased the generating machinery at the dam, some to the City of Los Angeles and some to Edison. It also, by its terms, made allotment contracts with the City and Edison, which incorporated the terms set out in the regulations. It provided in Article 14 (D) for the allocation of 6% of the power to a list of municipalities, including Burbank, Glendale, and Pasadena, and in Article 14 (F) (ii) it required the City of Los Angeles to take and pay for so much of the energy allocated to the municipalities as they did not take and pay for. It provided in Article 14 (F) for the allocation of power to the plaintiff. The other contracts, including the one made with the plaintiff, also covered the subjects of allotments and rates, and a copy of the lease was attached to and made a part of each contract. Article 37 of the lease said:

"Any modification, extension, or waiver by the Secretary of any of the terms, provisions, or requirements of this contract for the benefit of any one or more of the allottees (including the lessees) shall not be denied to any other."

As we have seen, the lease granted the load-building period to the City and Edison, whereby each was, for the first, second, and third years of its contract excused from taking more than 55, 70, and 85 per cent of the agreed amount of firm energy at the 1.63 mill rate, and, if it took more than those percentages, got the excess at the .5 mill rate. The municipalities of Burbank, Glendale, and Pasadena, as well as the plaintiff and the Gas Company, were not given this concession in their original contracts made in the autumn of 1931. But, as we have seen, in the autumn of 1934, following the signing of the "Memorandum of Understanding," the Secretary made supplemental contracts with the three municipalities in which it granted load-building periods to them on the basis of the same percentages as those granted to the City and Edison. On October 22, 1934, as shown in finding 11, the Secretary made a contract with the City, excusing the City from its guaranty that the municipalities would pay for their allotments of power, to the extent that their allotments were to be reduced by the load-building period which they were to be given.

The plaintiff claims that it was entitled to a load-building period because that concession was made to the municipalities. It points to Article 37 of the lease, quoted above. It says that the supplemental contracts with the municipalities were modifications of the lease (1) because the lease was incorporated in and made a part of each of the original contracts which were later modified, and (2) because the term of the lease itself, by which the City guaranteed to pay for the allotments of the municipalities at firm energy rates, if the municipalities did not pay, was modified by the contract of October 22, 1934, with the City. It also points to the fact that when, in 1938, the City became the assignee of the property and rights of the Gas Company, it on July 6, 1938, obtained a contract with the Secretary whereby, as such assignee of the Gas Company's contract with the Secretary, it was given a load-building period. The contract of July 6, 1938, which is quoted in finding 19, said that it was made to give the City, as assignee of the Gas Company, the same privileges given to other allottees on October 30, 1934, evidently referring to the supplemental contracts with the municipalities.

We think the plaintiff became entitled to a load-building period, when that concession was made to the municipalities and to the City as guarantor, and as assignee of the Gas Company. We think the lease and the contracts made with the allottees other than the lessees were intended to provide for equal treatment of the allottees, including the lessees, except as the lease and the original contracts which were contemplated by the lease, and into which the lease was incorporated, provided. The lease was modified when the requirement of its Article 14 (D) that the municipalities take 6% of firm power was reduced by the percentages of the load-building period, and when the requirement of its Article 14 (F) relating to the Gas Company was similarly reduced, for the benefit of the City as assignee. Its Article 14 (F) (ii) was modified when the City's guaranty to take or pay for the municipalities' allotment if they did not do so was reduced by the same percentages.

The government argues that the lease was not modified by these concessions to other allottees, but, as we have indicated, we do not agree. The Government also urges that, whether or not the plaintiff be-

came entitled to a load-building period, it received that concession, in its interim contract given it by the supplemental lease of July 22, 1937, shown in finding 17. By this lease it agreed to take specified quantities of power, during the interval of about two years and ten months before the time when its original contract of 1931 would have required it to take power, and to pay the firm power rate of 1.63 mills for this interim power, except that any power taken by it in excess of 55, 70, and 85 per cent of the specified quantities, during the first, second, and third years, respectively, of the interim contract, would carry only the .5 mill rate. We think that the acceptance of this interim contract by the plaintiff did not destroy its right, under the lease and its original contract, to have a load-building period of three years from June 1, 1940, the date when it became obligated under its original contract to begin to take and pay for power. The contracts of the municipalities, and of the City as assignee of the Gas Company, were modified so as to give them load-building periods from the corresponding times in their contracts. We think that the Government has no right to set up, as to the plaintiff, something which, it claims, is the equivalent of, or practically as good as, the thing which it had expressly agreed that the plaintiff should have. The load-building period given to the plaintiff in its interim contract was not, we think, intended to be given as a substitute for one to which the plaintiff was entitled under Article 37 of the lease. As will appear from the discussion of No. 45916, a complicated set of circumstances led to the making of the interim contract. The right, which the plaintiff claims, accrued to it as a result of a statute, regulations of general effect, and contracts made by an authorized public officer. The effect of these acts and contracts was to fix schedules of rates and terms on which those entitled to power from the dam would get it. The Government, as the vendor of power, should not be permitted to change those schedules to the prejudice of the purchaser. We conclude, therefore, that in No. 45688 the plaintiff's claim to the benefits of a load-building period for the three years beginning June 1, 1940, is well founded.

No. 45916 is, as we have said, based upon the claim that all of the power which the plaintiff took under its interim contract of July 22, 1937, and for which it paid 1.63 mills, except for the percentages covered by the load-building period, for which percentages it paid .5 mill, should have carried the .5 mill rate because it was secondary power. The plaintiff relies upon the Boulder Canyon Act, which, it contends, required that the power be disposed of under uniform regulations; the Regulations of the Secretary of the Interior, which set the rate of .5 mill for secondary power; the "Memorandum of Understanding" with the plaintiff and others, of October 3, 1934; the interim contract with the City of Los Angeles, of October 22, 1934, selling to it power which had express priority over the plaintiff's interim power, at the .5 mill rate; the "third circuit" contract with the City, of July 6, 1938, whereby the City was assured a specified amount of power, in addition to the firm power agreed to in its original lease, at the .5 mill rate; and the contract of October 14, 1938 with Edison whereby, without notice to the plaintiff, Edison was given a contract for unused firm power of the Metropolitan Water District at the .5 mill rate.

The Government's defense to this claim is, in substance, that the power available before the date of the first announcement which put the City's permanent contract into effect, and after each announcement but before the succeeding one, until the ultimate announcement of 4,240,000,000 k. w. h. of available power was made, putting the last of the contracts into effect, was power not covered by the Regulations or contracts, which the Secretary could refuse to sell at all, or sell on any terms he saw fit, and that the plaintiff is therefore bound by its contract to pay the agreed rates. As we have shown, the City and the plaintiff each applied for interim power. The conference of the interested parties with the agents of the Government produced the Memorandum of Understanding of October 3, 1934. That memorandum was intended as an agreement that various formal contracts would be made. All the contemplated contracts were made, except the one giving the plaintiff an interim contract, at the .5 mill rate. The City was given such a contract, and began to take power under it in October 1936, and ceased doing so on June 1, 1937, when its permanent contract began to operate.

The Secretary refused to approve an interim contract with the plaintiff on the terms provided in the Memorandum of Un-

derstanding. Further negotiations occurred in the succeeding years, and on July 22, 1937, an interim contract was made with the plaintiff. It leased to the plaintiff the generator which had been ordered by the Government in 1934, pursuant to the Memorandum of Understanding, and installed at a cost of $1,000,000, and required the plaintiff to pay its amortization and operating charges. It bound the plaintiff to take some 114,000,000 k. w. h. of power per year, designated the power to be taken as "firm" power, and fixed the firm power rate of 1.63 mills as the applicable rate. It granted the plaintiff a load-building period, for the interim, which meant that for power taken in excess of 55, 70, and 85 percent of the agreed amounts for the three successive years, the .5 mill rate would apply. The contract made the plaintiff's right to the release of any water for generating power subject to the conclusive determination of the Secretary that there was water available above what was needed for the fullest operation of equipment already or subsequently installed to serve the City of Los Angeles, or others having contracts for power. It provided that interim contracts might be made with others having contracts which did not yet entitle them to take power. Article 33 of the contract, quoted in finding 17, provided that if more favorable rates should be granted to any allottee or contractor, then the plaintiff should not thereafter be required to pay more than those rates. Article 33 was not, however, to apply to rates for the temporary resale of power allotted to the Metropolitan Water District.

The interim power which the plaintiff was entitled to under its contract was not "firm" power, as that term was used in the Regulations, lease, and contracts other than the interim contract. Firm power as defined was power which the Government agreed to deliver and the taker had the right to demand. The amount of firm power to be ultimately available had been conservatively estimated, so that the financing of the project would be sound, and it was always anticipated that there would be, in fact, a good deal more power than that which had been contracted for as "firm." The mere prospect or likelihood that power would be available was not, therefore, the basis of distinction between firm and secondary power. Yet the interim contract attached the label "firm" to the plaintiff's power, in contradiction of the use of the term in all other connections. The obvious purpose of the label was to justify the rate. The reason for the imposition of the rate was that the Secretary thought it would be unfair for the plaintiff to have the .5 mill rate for the three years before its permanent contract went into effect, while the City would be paying the full rate for a considerable percentage of its power.

The regulations, the lease, and the original contracts fixed the rates for firm and secondary power. We think they bound the Secretary, if he desired to market the power here in question, to charge the price for it which was applicable to its true nature. It was secondary power, because it was not agreed to be delivered, and was expressly made subject to the priorities of the City, and to being shared, if necessary, with others. The rate, set by public regulation and by agreement, applicable to secondary power, should have been applied to it.

■ The plaintiff asserts that, by Article V of the Regulations, Article (14) of the lease, and Article (7) of the plaintiff's original contract, which provided for the allotment of energy, it was entitled to a portion of the secondary energy at any time that such energy was available and was not taken by Metropolitan. If so, it was entitled to get it at the .5 mill rate set in the Regulations, lease, and contract for secondary energy. We think it was so entitled. A practical impediment to its getting it was, originally, that it would have no facilities for generating it until Edison took possession under its lease after 4,240,000,000 k. w. h. of energy were available. In fact the Secretary, by the plaintiff's interim contract of July 22, 1937, leased generating equipment to the plaintiff, thus making secondary energy available to it. But in the same contract, he labeled the secondary energy as "firm" and charged 1.63 mills for most of it. We think that, having made it available, he could not depart from the rate set in the Regulations, lease, and contract.

■ The so-called "third circuit" contract made by the Government with the City on July 6, 1938 is relied on by the plaintiff as bringing into play from that date the provision of Article 33 of the plaintiff's interim contract promising to it the benefit of any more favorable contract made thereafter. The City was proposing to build an additional transmission line,

and desired to obtain additional power. By this contract the Government agreed to supply 3,000,000,000 k. w. h. of additional power at the .5 mill rate during the period ending May 31, 1945. It also agreed to a formula for adjusting future rates for secondary power, the regulations, lease, and original contracts not having contained any provision for those rates.

We think that the third circuit contract, which gave the City a .5 mill rate for power, including interim power, which power, if secondary, yet had priority of right over the plaintiff's interim power, entitled the plaintiff under Article 33 to the .5 mill rate from July 6, 1938.

Edison's contract for firm power did not go into effect until June 1, 1940. The Metropolitan Water District had, in the original contracts, obligated itself to pay for 36% of the firm power generated at the dam. Its obligation was to begin when the Secretary announced the availability of 2,000,000,000 k. w. h., one year after the City's obligation became effective. In 1937 it was apparent that the 2,000,000,000 k. w. h. announcement would be made June 1, 1938. It had been expected from the beginning that Metropolitan would not, in fact, have use at least in the early years for its 36% of firm power, and the lease and contracts had provided that the Secretary might resell, for Metropolitan's account, what it did not use; that the City and Edison should each have an option to buy one-half of such power; that the plaintiff should have an option to buy 10% of Edison's one-half, and that if the Secretary proposed to sell such power he would notify the several parties having options. In 1937 the Secretary notified the parties, including the plaintiff, that he proposed to sell Metropolitan unused power, to begin June 30, 1938, at the 1.63 mills firm power rate. None of the parties exercised their options. On October 14, 1938, after the plaintiff had made its interim contract on July 22, 1937, the Secretary, without notice to the plaintiff, made a contract to sell Edison Metropolitan unused firm power at .5 mill. Failure to notify the plaintiff was a breach of the Government's contract giving the plaintiff an option to buy such power, and a right to notice when it was for sale. The Government urges that the plaintiff was not hurt by this alleged breach, since it had, by its interim contract, obligated itself to pay 1.63 mills for a specified amount of power, subject to the load-building concession of a rate of .5 mill for all above 55, 70, and 85% of the specified amount in the first, second, and third years, hence would be getting at .5 mill all the power it was free to buy at a rate other than 1.63 mills. The plaintiff replies that what it was getting under its interim contract at .5 mill was secondary power, subject to the priority of the City and the will of the Secretary, while what it was entitled to buy of the unused Metropolitan power was firm power, subject to no prior right in anyone. The plaintiff suggests that the reason it was not notified of the proposed sale of unused Metropolitan power was that if it had entered into the negotiations to buy firm power at .5 mill the absurdity of its having been charged 1.63 mills, in its interim contract, for secondary power, would have been so apparent as to demand a revision of that contract. We think there is probable merit in the suggestion. The provision of Article 33 of the plaintiff's interim contract would certainly have been called into play by the sale to Edison, except that Article 33 expressly provided that it should "not be construed to apply to rates and charges fixed in contracts covering the temporary resale of electrical energy allotted to" Metropolitan. The plaintiff claims that because of the Government's breach of its contract to notify it of the sale of Metropolitan unused power, the Government lost its right to insist upon the proviso in Article 33. We do not see the force of this argument, and, since we have concluded above that the plaintiff was entitled to the .5 mill rate, it is not necessary to determine what effect, if any, the Edison transaction may have had upon the plaintiff's rights.

The Government urges, with regard to both suits, that whatever rights the plaintiff may have had to a load-building privilege or to a .5 mill rate for its secondary power, it lost those rights by voluntarily entering into its interim agreement. The plaintiff says that it did not make the agreement voluntarily, but made it as a result of economic duress. We agree with the plaintiff. We have found that it did all that it could to obtain an interim contract along the lines of the 1934 Memorandum of Understanding. It was apparent in 1937 that this could not be accomplished. It would not have been prudent, even if it had been possible, for it in 1937 to have

obtained other sources of needed power, since it was to become bound in 1940 to take power under its contract, hence other arrangements would have had to be temporary. The 1.63 mills rate of its interim contract was probably less than it would have had to pay elsewhere. The fact that the Gas Company, with which it had had exchange arrangements, was being taken over by the City, which was not friendly and was questioning the validity of the exchange arrangements, made it imprudent for it to depend greatly on that source of power. One who has a right to obtain a service from a public utility, for which service there is a charge fixed by law, cannot estop himself from challenging a higher charge by an agreement to pay it. To a degree, the extent of which it is not necessary to determine, the same doctrine is, we think, operative in this case, and coupled with the economic duress to which the plaintiff was subject, it is sufficient to relieve the plaintiff of any waiver which might otherwise have resulted from its making of its interim contract. The Regulations, lease, and contracts made by the Secretary created a situation which contemplated and called for treatment of all parties on the basis of uniform definitions and rules. For him to change the defined meaning of terms, and make special applications of the rules to particular situations because he thought they called for special treatment, was, we think, a denial to the plaintiff of its rights under the Regulations and the contracts.

The plaintiff is entitled to recover in both cases. Judgment will therefore be entered for plaintiff in case No. 45688 in the sum of $82,172.54, and in case No. 45916 in the sum of $184,081.31. It is so ordered.

WHALEY, Chief Justice, and LITTLETON, Judge, concur.

WHITAKER, Judge (dissenting).

I do not think plaintiff is entitled to recover in either case. Under the original leases and contracts the plaintiff was not entitled to any power until 1940, when it was to take a part of that to be generated by the Edison Company beginning in that year. It wanted it earlier and induced the defendant to lease to it generating equipment so it could generate its own current and so get it earlier than it could under its arrangement with the Edison Company. Defendant was under no obligation to do this; nor was plaintiff under any compulsion to take the power. The parties were free contracting agents.

They entered into a contract for power on precisely the same terms as the city's contract. The only difference was the city was entitled to get its power first; but this was immaterial because there was plenty for both parties.

No more has been charged plaintiff than it agreed to pay. There has been no discrimination, and, so, I do not think plaintiff is entitled to recover.

JONES, Judge, took no part in the decision of this case.